May it please the Court, I'm Joseph Daly for the Lead Plaintiff Appellants. I'll try and save two minutes for rebuttal, Your Honors. This morning, Your Honors, I'm going to address the singular issue facing this Court, and that is whether the complaint allegations, considered collectively and holistically, raise an inference of scienter, that is actual knowledge or recklessness, that is cogent and at least as compelling as any inference that could be raised in the defendant's favor from the same facts. That strong inference of scienter arises from the following mosaic of facts. First, the defendant's access to information combined with the scheme's outsized importance to National General. Now, National General's self-described, quote, complete thorough due diligence, end quote, at QBE, where the CPI scheme had been ongoing since 2002. From 2012 to 2016, just over four years, that scheme ensnared some 800,000 customers while pushing 274 of them into delinquency. National General's unusual, quote, flat management structure, end quote, with a conceded open-door policy leading right up to Carfunkel at the top of the executive suite. He was, quote, on top of what goes on in the lender division, end quote. That is the division. Well, just focusing on the due diligence for a moment, what is it about, you started with the importance of this business to National General. What, other than the fact that they did due diligence and there are various allegations that it was thorough due diligence, what is it that makes you say it's, that we should infer that they had knowledge of the scheme and therefore were acting knowingly or recklessly with regard to the statement? Thank you, Your Honor. It's not only the due diligence. It is a combination of that due diligence started the process of the knowledge. It leads down, though, to these monthly CPI scorecards and the quarterly business review decks. We've got National General's own track guard system where the complaint alleges that thousands of complaints about the CPI scheme were handed over to National General and Wells Fargo. That's a pleaded fact that must be accepted as true. And everything that I've just mentioned, the due diligence, the business review decks, the scorecards, that was all corroborated in early 2017 by the Oliver Wyman report, a 60-page report detailing with granular detail the parameters of the scheme. 800,000 consumers unlawfully, illegally having this insurance hoisted upon them. 274,000 of them with their accounts going into delinquency. 24,000 of them having their automobiles possessed because, again, repossessed, sorry, because of the scheme. You combine that with the sheer importance of the scheme to National General. The CPI premiums represented fully 20% of the premiums in that brand-new lender-placed insurance division, the LPI division. The defendants themselves repeatedly harped upon how that division was going to be, quote, accretive to National General's earnings and was accretive. And when that scheme was halted in September of 2016, it resulted in some stunning financial reversals at National General. The net written premiums in just one quarter year over year plummeted from $126 million to just $47 million. National General's net income went from a positive $45 million year over year in just one quarter to a negative $5 million. That's a $50 million swing in profitability in the company that said this new LPI division is going to be accretive to our earnings. Those facts bolster the inferences in plaintiff's favor. The unreasonable inference left in the defendant's favor is that National General's top executives, like the three defendants here, would not have been privy to any of those various reports concerning a key money-making division. They would not have been privy to the results of the Oliver Wyman report. While at the same time when that report came out, there was still a year left in the class period. And nonetheless, the defendants continued to make false statements and omissions. They continued to claim that premium growth in National General had been, quote, driven by the LPI division. Well, that's the division where the CPI scheme had just been shut down by Wells Fargo. They continued to claim robust compliance with the Consumer Financial Protection Bureau mandates. And when it came to discussing the loss of a major client, they lied and said the loss of that client was for purely innocent reasons. That is, that the client had decided to self-insure, which was not the case at all. That was an out-and-out false statement. Wells Fargo had shut down the illegal CPI scheme in September of 2016. Now, that, I submit, is enough to get us over the scienter hurdle. But we do have more. We have the concrete benefits that the defendants gained from keeping this scheme hidden from shareholders. And although the district court focused on... Can you just elaborate just a little bit? The district court acknowledged that the business dex were the closest call in its view. Can you elaborate on what is in the business dex and the other data that's exchanged at those meetings that would have supported your theory? The material within the business dex, and it's in our brief. I don't have it committed to memory, but we do have a block quote of just the granular 10 and 12 categories of material, all having to do with the CPI, the collateral protection insurance. Claims rates, cancellation rates, trends, complaints to the company from CPI customers. Those business review dex gave a granular picture of what was going on every quarter within that division. And as I mentioned, the Oliver Winer report from an independent consulting company corroborated what was in those business review dex. It's a strong inference in our favor. Yes, we don't have the physical business review dex in our possession right now. No, I cannot tell you that that business review dex was handed to defendant Kastner, for example. But Kastner was the president of that division. He came over from QBE. 11 years at QBE, he was the president of the new division, and he reported directly to Carfunkel. I'd like to reserve the rest of my time, please. Thank you. Thank you, Chief Judge Livingston, and may it please the Court. Derek Schaefer here on behalf of the FLDs. Your Honors, this Court's governing precedents are clear, consistent, and unequivocal in enforcing the requirement that any plaintiff alleging securities fraud plead the relevant allegations with particularity so as to raise a strong inference of fraud. Those requirements carry particular import for the element of scienter, which the district court rightly recognized in ruling that plaintiffs fall far short of the established mark. Indeed, plaintiffs' generic fraud allegations, generic banal allegations, do not reflect particularity of any kind about what specifically any defendant learned, when, or how, relative to any alleged misrepresentation. And I encourage Your Honors to look at the complaint paragraphs 140 to 164. That's where Mr. Daley and his clients report to establish the particularity of scienter. And you will not find there, with all due respect to my friend for the other side, any of the allegations that would rise to the level of what this Court's precedents specifically require. And when I talk about this Court's precedents, I'm talking about a parade of cases that hold the allegations you have here categorically incapable of establishing the requisite strong inference of scienter with the requisite particularity. And for one case, Your Honor, I commend to you the Jackson decision of this Court. And what this Court put its finger on there is the same thing that Judge Etkin did in this case, the lack of, quote, connective tissue, close quote, as far as what was learned, who it was learned by, when it was learned, so as to establish scienter consistent with the PSLRA. And that's at 960F3rd at 99. Your Honors, the District Court therefore had no choice but to hold these allegations inadequate. It nonetheless gave the plaintiffs every benefit of the doubt in granting their request for leave to amend. They had the particularity that was lacking. They had the opportunity to come back, filling in these blanks. By forfeiting that opportunity, plaintiffs left the District Court without any option other than to enter the judgment issue against them. And this Court should have no difficulty affirming. Now, Mr. Daley talked specifically about the, in response to your question, Chief Judge Livingston, about what's in those business reports, which is the raw data that this Court has said in Dynex and its progeny in the Southern District of New York has said, you can't just point to raw data. You have to say what specifically was reported and to whose attention that came. You won't find those specifics. You won't even find specifics about individual defendants being at meetings with Wells Fargo or about individual defendants coming into possession or being privy to any of these supposed reports. One thing that is— Well, I think there were some, correct me if I'm misremembering the record, but there were some, there was allegations about these policies did not generate many claims because many of the customers didn't know about them, and that information would have been reflected in the business decks. And I take it, yes, there's no specifics about who saw those business decks. But at some point, do you say the information was so out of whack that they must have known? I wouldn't rule out, Chief Judge Livingston, that you might see that case one day. I can just tell you this is not that case. In paragraph 70 of the complaint, you'll see the specific allegation. It was disclosed when National General was acquiring the CPI line of business. It had a low loss ratio business. That was a feature, Your Honors. That was not above. There was nothing felt to be sinister about that. It was just a well-performing business. And the reports, Chief Judge Livingston, there's nothing that says there were flags on them. There's nothing that says there was a high incidence of complaints relative to a baseline that you would expect. There's nothing that says the complaints were about something other than, say, the pricing that customers didn't like. There's nothing that gives you the granularity about what was it that said there was illegality, that there was something that Wells Fargo was doing with this program, as ultimately uncovered by Oliver Wyman, that one looking at from afar, as National General would have known, was problematic. And that's why Mr. Daley emphasized the Oliver Wyman report. But remember, that was a report that, according to the complaint, it was commissioned by Wells Fargo, and it was secret. The allegations of the complaint spell that out. You can see it in paragraph 11. That was not disclosed. Oliver Wyman's report was, as you would expect, a sensitive inquiry like this by Wells Fargo to be kept under wraps. And it was. They say that in their brief at page 10. So then the notion is somehow Oliver Wyman's report came to the attention of National General when no one else knew about it. There's no allegation in the complaint, nothing, Your Honors, nothing particular. It says here's how the Oliver Wyman report or the substance of it came to the attention of National General, anyone at National General, let alone these individual defendants. And so Mr. Daley says, well, the raw business data that was reported in these scorecards, we don't know to whom they went or when they went, that reflected the same information that was available from the Oliver Wyman report. Chief Judge Livingston, there's no allegation in the complaint that says that. They argue that. They want the inference. But they don't have the particularized allegation that they need. And to credit, their arguments here would basically be to do away with the requirement of particularity, and this Court's careful precedent enforcing it in this specific context. Now, the other thing that Mr. Daley points to, and you asked about, Chief Judge Livingston, is things like due diligence. Well, what is it about doing competent, thoroughgoing due diligence that establishes scienter? If that suffices, every corporation that does due diligence, no one does it incompetently. Everyone's trying to be thorough about it. Everyone's trying to figure out the facts. That sort of innocent, desirable conduct by publicly traded companies does not establish scienter. They need something that is abnormal. They need something that is suspicious. And simply saying, we've done our due diligence, we have executives who are on top of things, that's not the stuff of scienter. There's no case that suggests that could be the stuff of scienter. And if it became the stuff of scienter, that would be undoing all the careful work of Congress and this Court and the Southern District of New York and all the lower courts in this jurisdiction that have been so careful to enforce the scienter requirements. And, Your Honor, one other point, if I may. The other side makes a lot out of the fact that there was illegality in terms of the CPI program. And so that in and of itself establishes motive and opportunity for my clients to basically be fudging the facts. It's as though if you have a fraud that's about underlying illegality, you somehow relax the scienter requirement. Because it's not the innocent motive to just maintain corporate profitability and convince everyone that somehow becomes transformed into something wrongful. There's no case that says that, Your Honor. It's totally circular. You can't presuppose that these defendants knew about the fraud and knew about the underlying illegality. The question is, would you attribute to executives and to a company that simply is assuring people that this is a profitable, sound business, a wrongful intent because they want to maintain corporate profitability? This Court's been careful not to allow plaintiffs to do that. And even in cases where the fraud is about underlying illegality, the same scienter requirement has been enforced the same way. Could you address the sale by Amtrust of the National General stock? Yes, Your Justice. Let me see. Not a sale by any insider. So if anything, the absence of sales goes the other way. As to the sale, there's nothing that says it was a profitable sale. There's nothing about what was paid going in. This Court has indicated that you need to establish profitability even if you have a sale by an insider. Nor is there any allegation that this was an especially large sale relative to what Amtrust held of the National General stock. They say at the outset they have a lot of the stock, but they don't say how much this particular sale represented. And here's my last point, Chief Judge Livingston. Consider the timing. When we talk about a strong inference of scienter, their theory of why this sale happened when it did is completely incoherent, even if it was done by the defendants. The sale happens in June of 2017. That's two years after this acquisition of the CPI program that supposedly anyone would have known. It was illegal. It was a house of cards. It was destined to fall apart. There's a stock cop. There's no trade. Then you have the Oliver Wyman report that's underway. And that supposedly, according to plaintiffs, is revealing all sorts of wrongdoing. There's no trading off of that from when the Oliver Wyman report starts in July of 2016 to February 2017. Then you have National General going to the public and saying, we've lost a big client, and they are not coming back. That's set in February. And in May of 2017, you have an analyst asking about that. Was this a problem? How big a problem? You can see this in paragraphs 126, 128 of the complaint. No trading. No insider trading off of that at all. And then finally, the sale happens after there's hits to the stock. It happens in June of 2017. That's a month and a half before the New York Times breaks free of the Oliver Wyman report. There is no allegation, Your Honors, that anyone knew when the New York Times story was going to come out and that that was going to be, you know, the coup de grace here. And there's certainly no allegation that any of these defendants tipped off the land trust here. So in our view, that allegation is a total red herring. There's no way it helps them out with motive and opportunity here or with an indication of conscious wrongdoing. Thank you, Your Honors. If there are no further questions, I will succumb. We'll hear rebuttal. Thank you, Your Honor. Two quick points having to do with raw data and the lack of connected tissue. As to the former, the raw data in the business review decks, if this Court would look at our opening brief, page 30, right at the bottom there's a large block paragraph listing the granular detail that would be in those business review decks. Defendants suggest that perhaps they didn't see the Oliver Wyman report that corroborates the matters included in those business review decks. I mean, that's a fantastic assertion because Oliver Wyman said that it based its report upon, quote, extensive interviews with National General personnel. We get the inference there that National General knew about that. And not only that, that report spurred Wells Fargo to bring this CPI scheme to a screeching halt. You would have thought that the top three executives at National General, the screeching halt, would investigate that further and not keep making misstatements to the market. The second point, lack of connected tissue. What the district court demanded, with respect, was direct evidence. And that's what defendants are demanding. The Supreme Court in Herman and McLean v. Huddleston says no. In securities litigation, circumstantial evidence suffices. And I've already told this Court 12 minutes ago, all we have is circumstantial evidence here. But what we have is circumstantial evidence that, taken together, forms such a tightly interwoven mosaic of facts. The inference arising out of that, we submit, are irrebuttable. The opposing inference is in defendants' favor. They just don't make sense. I've got 18 seconds left. I'm just going to wrap up, Your Honors, if you have no further questions. I think at the end of the day, taking a look at all of the pleaded facts, accepting them as true, which this Court must do at the motion to dismiss stage, they together raise a strong inference of scienter. Thank you very much, Your Honors. Thank you both. Nicely done. And we will take the matter under advisement.